# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

FILED
MAY 0 7 2008   NF
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

CRIMINAL COMPLAINT

v.

GALO J. SANCHEZ
also known as Gordo

CASE NUMBER

MAGISTRATE JUDGE NOLAN

08CR 366

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From on or about **May 7, 2008**, in **Cook** County, in the **Northern** District of **Illinois**, and elsewhere, defendants did

knowingly and intentionally to possess with the intent to distribute a controlled substance, namely, in excess of 500 grams of cocaine, a Schedule II Controlled substance,

in violation of Title **21** United States Code, Section **841**. I further state that I am a **Inspector, Illinois State Police Department** and that this complaint is based on the following facts:

Please see attached affidavit.

Continued on the attached sheet and made a part hereof:  **x** Yes ___ No

X _____
Signature of Complainant

Sworn to before me and subscribed in my presence,

May 7, 2008                                          at          Chicago, IL
Date                                                              City and State

Nan R. Nolan, Magistrate Judge
Name & Title of Judicial Officer

_Nan R. Nolan_
Signature of Judicial Officer

STATE OF ILLINOIS      )
                       )  SS
COUNTY OF COOK         )

## AFFIDAVIT

I, Scott Maton, being duly sworn and under oath, states as follows:

1. I am an Inspector with the Illinois State Police, Narcotics and Currency Interdiction ("NARCINT") unit, in Chicago, Illinois. I am an investigator and law enforcement officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21, United States Code. I have been employed as a Dolton Police Officer from 1995 through present. I have been assigned as an Inspector with the Illinois State Police NARCINT unit, in Chicago, Illinois, since 2000.

2. This affidavit is submitted for the limited purpose of establishing probable cause in support of the attached complaint and therefore contains only a summary of the relevant facts. I have not included each and every fact known by me concerning the individuals and events described herein. The information contained in this affidavit is based on my personal participation in this investigation and from reports made to me by other law enforcement agents, from records, documents, and other evidence obtained as a result of this investigation, and from individuals associated with and who have knowledge about the affairs of the subject individuals in this investigation and their confederates. I have not included each and every fact known by me concerning the individuals and events described herein.

3. Special agents of the Illinois State Police, Narcotics and Currency Interdiction ("NARCINT") unit, in Chicago, Illinois, have been conducting an investigation of individuals who are distributing cocaine throughout the city of Chicago, Illinois. During the course of this

1

investigation, information from a confidential source has described the below detailed individuals and events.

4.     On May 1, 2008, law enforcement officers from the NARCINT unit and officers from the Westlake Police Department from Westlake, Ohio, spoke with a CS[1] regarding narcotics trafficking in the Chicago area. The CS stated that he and Galo J. SANCHEZ, also known as "Gordo," made several trips from Akron, Ohio, to the Chicago area over the past two years to pick up large amounts of narcotics, specifically cocaine and marijuana. SANCHEZ has been identified as a Hispanic male, born on July 1, 1985. The CS stated that on four or five occasions he and SANCHEZ met with an unidentified Hispanic male (INDIVIDUAL 1) at a residence located in the area near the 2300 block of south Kedzie Avenue, in Chicago, Illinois, to pick up narcotics in exchange for large amounts of U.S. currency. According to the CS, SANCHEZ would speak to the unidentified Hispanic male on SANCHEZ's cellular telephone and make arrangements to purchase narcotics. The CS would then drive SANCHEZ, in a car owned by the CS, to meet with the unidentified Hispanic male at a residence in the Chicago area. SANCHEZ would provide the money to the unidentified Hispanic male and the unidentified Hispanic male would either give the narcotics to SANCHEZ, or a third person in the residence would give the narcotics to SANCHEZ. The CS and SANCHEZ would leave the residence, place the narcotics in the CS's car, and the CS and SANCHEZ would drive back to Ohio.

---

[1] The CS was convicted of Aggravated Robbery and sentenced to 3 years imprisonment in April 1999 in the State of Ohio. He is currently serving 5 years of Court supervision. On April 29, 2008, Westlake Police Department arrested the CS for possession of 20 grams cocaine. The Westlake Police Department told the CS that if he agreed to cooperate with law enforcement and provide information and work in an undercover capacity to build two criminal cases; one in Westlake, Ohio, and one in Chicago, Illinois, no criminal charges for the possession of 20 grams of cocaine would be filed.

2

5. In March of 2008, the unidentified Hispanic male directed SANCHEZ and the CS to meet with an unidentified Hispanic male wearing a purple shirt. On this occasion, the CS and SANCHEZ met with the unidentified Hispanic male in the purple shirt (INDIVIDUAL 2), who gave SANCHEZ and the CS 24 kilograms of cocaine and approximately 10-15 pounds of marijuana.

6. According to the CS, he and SANCHEZ had been making plans to travel to the Chicago area to pick up cocaine and marijuana on Tuesday, May 6, 2008, from the unidentified Hispanic male. Over the last couple of days, the CS had called cellular telephone number (330)524-6894 to speak to SANCHEZ.

7. On or about April 29, 2008, at approximately 4:30 p.m. EST, the CS conducted a consensually monitored and recorded telephone call to SANCHEZ on cellular telephone number (330) 524-6894. An officer from the Westlake Police Department monitored the telephone call. SANCHEZ and the CS discussed conducting a meeting on Monday, May 5, or Tuesday, May 6, to meet with a source who would provide them with narcotics. Additionally, the CS discussed owing SANCHEZ $7100.

8. On or about April 30, 2008, at approximately 7:02 p.m. EST, the CS conducted a consensually monitored and recorded telephone call to SANCHEZ on cellular telephone number (330) 524-6894. An officer from the Westlake Police Department monitored the telephone conversation. SANCHEZ told the CS that he (SANCHEZ) had set up a meeting with a source for narcotics in Chicago for "20" and "20". The CS understood that SANCHEZ meant that SANCHEZ had arranged for a meeting with the unidentified Hispanic male in the Chicago area to provide 20 kilograms of cocaine and 20 pounds of marijuana. The CS told SANCHEZ that he (the CS) had a buyer for the narcotics and that the buyer would provide money for the narcotics. The CS also told

SANCHEZ that the buyer was flying in to meet with the CS. The CS asked SANCHEZ if was going to make contact with SANCHEZ's source in Chicago to pick up narcotics.

9. On or about May 1, 2008, at approximately 9:55 p.m. CST, the CS conducted a consensually monitored and recorded telephone call to SANCHEZ on cellular telephone number (330) 524-6894. An officer from the Westlake Police Department monitored the telephone call. SANCHEZ told the CS that the source would "front" the CS "18 and 20". The CS understood that SANCHEZ meant that the unidentified Hispanic male (INDIVIDUAL 1) would provide the CS 18 kilograms of cocaine and 20 pounds of marijuana and the CS would not have to provide the source any money for the narcotics yet. The CS asked SANCHEZ where the source in Chicago lived and SANCHEZ stated that the source had been living in the area of the 2300 block of South Kedzie Avenue in Chicago, but the source moved frequently to hide his location.

10. On May 3, 2008, at approximately 1:34 p.m. EST, the CS conducted a consensually monitored and recorded telephone call to SANCHEZ on cellular telephone number (330) 524-6894. An officer from the Westlake Police Department monitored the telephone call. The CS and SANCHEZ agreed to meet at SANCHEZ's house at approximately 2:00 p.m.

11. On May 3, 2008, at approximately 2:20 p.m., the CS met with SANCHEZ at SANCHEZ's residence at 1352 Howard Street, Apartment 512, in Akron, Ohio, and received approximately 80 grams of cocaine from SANCHEZ. Prior to the meeting, an officer from the Westlake Police Department searched the CS to insure that he did not have any narcotics with him when entering the apartment to meet with SANCHEZ. The CS did not have any narcotics with him prior to meeting with SANCHEZ. The CS was also wearing a microphone to record the conversation between the CS and SANCHEZ. An officer from the Westlake Police Department

monitored the conversation between the CS and SANCHEZ. The CS gave SANCHEZ $7100 that he owed SANCHEZ for previous narcotics purchases. NARCINT had given the CS $7100 to be given to SANCHEZ for past drug transactions. The CS was to sell the 80 grams to a prospective buyer who, if the buyer liked the 80 grams of cocaine, would buy a large amount of cocaine from SANCHEZ. The CS and SANCHEZ would then drive to Chicago to pick up the additional cocaine on Tuesday, May 6, 2008. During the meeting between the CS and SANCHEZ, SANCHEZ discussed the trip that the CS and SANCHEZ would make to the Chicago area on May 6, 2008, to pick up 18 kilograms of cocaine from INDIVIDUAL 1 that had provided the narcotics to SANCHEZ and the CS in the past. Once back in Ohio, SANCHEZ would give the CS 10 kilograms to sell to a prospective buyer. When the CS left SANCHEZ's apartment, an officer from the Westlake Police Department retrieved the 80 grams of cocaine from the CS. An officer also searched the CS to insure that he did not have the $7100 that he had entered the apartment with. The CS did not have the $7100. An officer from the Westlake Police Department conducted a field test of the suspected cocaine, and the suspected cocaine tested positive for cocaine.

12. On May 4, 2008, SANCHEZ, using his cellular telephone, spoke to INDIVIDUAL 1 in the presence of the CS. The CS told an officer of the Westlake Police Department what had occurred during the conversation. SANCHEZ told the CS that INDIVIDUAL 1, who had provided narcotics to the CS and SANCHEZ in past, was not in the Chicago area but was in Iowa and would not be in the Chicago area to meet with the CS and SANCHEZ on Tuesday, May 6, 2008. According to SANCHEZ, INDIVIDUAL 1 told SANCHEZ that SANCHEZ and the CS could either come to Iowa to meet him and he would front the CS and SANCHEZ 36 kilograms of cocaine. The CS would have to provide $3000 to INDIVIDUAL 1. The CS told SANCHEZ that he did not have

$3000. SANCHEZ then stated he and the CS would go to Chicago and meet with an associate of the unidentified Hispanic male (INDIVIDUAL 3), pick up 18 kilograms of cocaine, and not have to give him any money yet.

13. On May 6, 2008, the CS and SANCHEZ left Akron, Ohio, at approximately 1:00 p.m. CST, and drove to the Chicago area. Once in the Chicago area, officers from the Westlake Police Department monitored the conversations between the CS and SANCHEZ and officers from NARCINT and the Westlake Police Department followed the vehicle that the CS and SANCHEZ were driving.

14. The CS and SANCHEZ drove to the area of 23rd Street and Kedzie Avenue where they got out of their car and met with an unknown Hispanic male (INDIVIDUAL 4), who was driving a dark colored SUV. The CS and SANCHEZ got into the SUV and drove approximately one block. SANCHEZ gave INDIVIDUAL 4 an unknown amount of money. The CS and SANCHEZ got out of the SUV and got back into the CS's car. Once in the CS's car, SANCHEZ told the CS that they would be driving to Iowa to get narcotics. The CS and SANCHEZ eventually drove to I-290 and drove west. Officers from the Westlake Police Department, who were monitoring the conversations between the CS and SANCHEZ, heard the CS and SANCHEZ discuss driving to Iowa.

15. The CS and SANCHEZ drove to Moline, Illinois, located on the Illinois and Iowa border, where they met with two unidentified Hispanic males (INDIVIDUALS 5 and 6) in front of a Wal-Mart. The CS, SANCHEZ, and INDIVIDUALS 5 and 6 entered the Wal-Mart. The CS, SANCHEZ, and INDIVIDUALS 5 and 6 left the Wal-Mart after the CS purchased flowers. Upon exiting the Wal-Mart, the CS, SANCHEZ and INDIVIDUALS 5and 6 met with a another unidentified Hispanic male (INDIVIDUAL 7), who was driving a dark colored van. SANCHEZ met

with INDIVIDUAL 7 who was driving the dark colored van, at which time, INDIVIDUAL 7 handed SANCHEZ a paper gift bag. SANCHEZ placed the paper gift bag in the trunk of the CS's car. The CS and SANCHEZ entered the CS's car and drove east bound on I-80.

16. Officers from the Illinois State Police stopped the CS's car on the exit ramp of I-80 and LaGrange Road, located in Will County, within the Northern District of Illinois. Officers searched the vehicle, at which time, the officers discovered a paper gift bag containing four packages of a white powdery substance, suspected cocaine, in the trunk of the CS's car. The officers field tested a representative sample from the cocaine and it field-tested positive for cocaine.

17. Based on all the foregoing, there is probable cause to believe that SANCHEZ knowingly and intentionally possessed with intent to distribute in excess of 1 kilogram of cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841.

Scott Maton, Inspector
Illinois State Police
Narcotics and Currency Interdiction ("NARCINT")

Subscribed and sworn to before me
This 7th day of May 2008

Nan R. Nolan
U.S. Magistrate Judge

7